1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MICHIGAN
2                  SOUTHERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )
4   -vs-                           )     Criminal Case No.
                                   )
5   D-3 JAMES WARNER,              )     2:18-cr-20255-VAR
                                   )
6              Defendant.          )
    _____

7
          VERDICT IN JURY TRIAL - VOLUME NINE of NINE
8          BEFORE THE HONORABLE VICTORIA A. ROBERTS
           UNITED STATES DISTRICT JUDGE, and a JURY
9          Detroit, Michigan - Wednesday, June 5, 2019

10

11  APPEARANCES:

12  FOR THE GOVERNMENT:     EATON P. BROWN, ESQ. and
                            MARK CHUTKOW, ESQ.
13                          United States Attorney's Office
                            211 W. Fort Street, Suite 2001
14                          Detroit, Michigan 48226
                            (313) 226-9184
15

16  FOR THE DEFENDANT:      ROBERT S. HARRISON, ESQ. and
                            NICHOLAS A. GALEA, ESQ.
17                          Robert Harrison & Associates, P.L.C.
                            40950 Woodward Avenue
18                          Suite 100
                            Bloomfield Hills, Michigan 48304
19                          (248) 283-1600

20

21

22
    REPORTED BY:            Darlene K. May, CSR, RPR, CRR, RMR
23                          231 W. Lafayette Boulevard
                            Detroit, Michigan 48226
24                          (313) 234-2605

25                            TABLE OF CONTENTS

1

2   PROCEEDINGS:                                                PAGE

3     Appearances                                               3

4     Verdict of the Jury                                       3

5     Motion for Remand

6        Argument by Ms. Brown                                  7
         Response by Mr. Galea                                  9
7        Response by Mr. Harrison                              11
         Ruling by the Court                                  16
8

9     Court Reporter's Certificate                            22

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     Wednesday, June 5, 2019

2     11:30 a.m.

3                     -- --- -

4          THE CLERK OF THE COURT:  All rise for the jury.

5      (At 11:31 a.m., jury enters courtroom.)

6          THE CLERK OF THE COURT:  Be seated.

7          The United States District Court for the Eastern

8  District of Michigan is now in session.  The Honorable Victoria

9  A. Roberts presiding.

10         The Court calls the case of the United States versus

11 James Warner, case number 18-20255.

12         Counsel, your appearances, please.

13         MS. BROWN:  Good morning, Your Honor.  Eaton Brown and

14 Mark Chutkow appearing on behalf of the United States.

15         THE COURT:  Good morning.

16         MR. CHUTKOW:  Good morning.

17         MR. HARRISON:  Good morning, Your Honor.  Robert

18 Harrison and Nicholas Galea appearing on behalf of James Warner

19 who stands next to us here at counsel table.

20         THE COURT:  Thank you.  Good morning, everyone.  You

21 can take your seats.

22         Ladies and gentlemen, I understand you have reached a

23 verdict.

24         THE FOREPERSON:  Yes.

25         THE COURT:  And could you pass the verdict form to

1  Ms. Vertriest.

2          THE COURT:  Thank you.

3      (Verdict passed.)

4          THE COURT:  Thank you.

5          Mr. Warner, would you please rise.

6          And, Ms. Seelbach, could you please rise and announce

7  the verdict of the jury.  If you can read each count and say

8  what the verdict is.

9          THE FOREPERSON:  Count One, Conspiracy to Commit Theft

10  from a Federally Funded Program and/or Federal Program Bribery,

11  William Pritula, guilty.

12          Count Two, theft from a Federally Funded Program,

13  William Pritula, guilty.

14          Count Three, theft from a Federally Funded Program,

15  William Pritula, guilty.

16          Count Four, Conspiracy to Commit Money laundering,

17  William Pritula, guilty.

18          Count Five, Conspiracy to Commit Theft from a

19  Federally Funded Program and/or Federal Program Bribery,

20  Douglas Earles, guilty.

21          Count Six, Conspiracy to Commit Money Laundering,

22  Douglas Earles, guilty.

23          Count Seven, Conspiracy to Commit Federal Program

24  Bribery, Gary Tenaglia, guilty.

25          Count Eight, Conspiracy to Commit Money Laundering,

1 │ Gary Tenaglia, guilty.

2 │          Count Nine, Federal Bribery -- Federal Program

3 │ Bribery, Gary Tenaglia, guilty.

4 │          Count Ten, obstruction of justice, guilty.

5 │          THE COURT:  All right.  Thank you very much.  You can

6 │ take your seat.

7 │          You can take your seat, Mr. Warner.  Thank you.

8 │          Ladies and gentlemen, I would like to poll each of you

9 │ now to make sure the verdict as announced is one that you're in

10 │ agreement with.

11 │          So, Ms. Priscilla Hall-Williams, is this your verdict?

12 │          JUROR No. 1:  Yes.

13 │          THE COURT:  Ms. Donna Hurt, is this your verdict?

14 │          JUROR No. 2:  Yes.

15 │          THE COURT:  Mr. Lee Dunaj is this your verdict?

16 │          JUROR NO. 3:  Yes.

17 │          THE COURT:  Mr. Lee Clark, is this your verdict?

18 │          JUROR No. 4:  Yes.

19 │          THE COURT:  And Mr. Michael Azar, is this your

20 │ verdict?

21 │          JUROR No. 5:  Yes.

22 │          THE COURT:  Thank you.  Ms. Barbara Woodrich, is this

23 │ your verdict?

24 │          PROSPECTIVE JUROR No. 6:  Yes.

25 │          THE COURT:  Mr. Rafah Odish, is this your verdict?

1          PROSPECTIVE JUROR NO. 7:  Yes.

2          THE COURT:  Ms. Ponce de Leon, is this your verdict?

3          JUROR No. 8:  Yes.

4          THE COURT:  Mr. Date, is this your verdict?

5          JUROR No. 9:  Yes.

6          THE COURT:  Ms. Huntington, is this your verdict?

7          JUROR No. 10:  Yes.

8          THE COURT:  Ms. Seelbach, is this your verdict?

9          JUROR NO. 11:  Yes.

10          THE COURT:  And, Mr. Keener, is this your verdict?

11          JUROR NO. 12:  Yes.

12          THE COURT:  Thank you.  Ladies and gentlemen, you have

13    been very attentive.  You certainly have done your duty and

14    have lived up to the oath that you took -- when was that, a

15    number of days ago.  So we absolutely thank you for your civic

16    duty and for the sacrifice that you have made.

17          Linda, will see you back in the jury room.  I would

18    like to talk to you for a moment and you are discharged from

19    your service.

20          All rise for this jury, please.

21        (At 11:38 a.m., jury exits courtroom.)

22          THE COURT:  All right, everyone.  You can take your

23    seats.  I believe we have a date for Mr. Warner's sentence.

24          THE CLERK OF THE COURT:  October 8th, 2019 at 3 p.m.

25          And Mr. Warner is on bond, any objection to that

1  continuing?

2          MS. BROWN:  Yes, Your Honor.

3          THE COURT:  You have an objection?

4          MS. BROWN:  Yes, Your Honor.  We would move for him to

5  be remanded and happy to proceed with argument now.

6          THE COURT:  Please.

7          MS. BROWN:  So under Section 3143(a) of Title 18, it

8  dictates that a court:  "Shall detain a person found guilty of

9  an offense unless the defense provides clear and convincing

10 evidence that he is not a risk of flight or a danger to

11 himself."

12         So we believe that he -- a couple of things.  First is

13 that he is a risk of flight.  Now he has an incentive to flee.

14 He's looking at guidelines of 292 to 365 months.  So he has an

15 incentive now to flee.

16         Secondly, he has the means to flee.  The bank records

17 and the finances that were discussed during trial date only

18 back to 2010 because of bank retention policies.  So we don't

19 even have a full picture of the monies that were in, perhaps,

20 all of Mr. Warner's accounts.  What we do know is that the

21 government had seized a little over four million dollars of his

22 5.4 million dollar ill-gotten gain.  So there's an outstanding

23 over one million dollars that has yet to be accounted for which

24 would provide the defendant the means to flee, should he choose

25 to.

1          But, thirdly, and most importantly, we believe he is a

2     risk of harm to himself.  Reading from that letter that was

3     referenced and the defense tried to admit, Defense Exhibit 604,

4     a letter from the defendant's psychiatrist.  It's dated July

5     6th of 2017.  This was prior to the defendant being indicted, I

6     would note.

7          And they -- in it he says, "I have treated Mr. Warner

8     over the years for major depression and generalized anxiety

9     disorder."

10         He goes on to list approximately seven psychotropic

11    medications the defendant is currently taking.  And says that,

12    "These medications may have led him to make poor and unintended

13    decisions."

14         Which I think could be applicable in this case that

15    he, again, is a risk to himself given his condition and his

16    ability or tendency to make poor and unintended decisions.

17         But perhaps, most importantly, four months after that

18    our office was notified that the defendant was found in a barn

19    suffering from carbon monoxide poisoning because he had locked

20    himself inside with a gas generator running.  That prompted him

21    to be admitted to Hazencrest Mental Facility.  And I don't know

22    exactly how long he stayed there, but clearly our reading of

23    that was that the defendant was attempting suicide.

24         And, again, that was back in November of 2017 before

25    he was even indicted and certainly before he was convicted and

1  facing in the neighborhood of 30 years.

2              So if he was a risk to himself then, he is most

3  definitely a risk to himself now.  So for all those reasons we

4  believe under Section 3143(a), he should be remanded into the

5  custody of the Federal Bureau of Prisons.

6              THE COURT:  Mr. Harrison, do you have a response?

7              Or Mr. Galea?

8              MR. GALEA:  Your Honor, I'll take this.  Thank you.

9              Your Honor, Mr. Warner has been on bond since May of

10  last year since when this case was formally indicted.  There

11  was no objection to his bond at that time.

12              Under 3143, there is a presumption of detention which

13  is a difference from pretrial release.  However, if the defense

14  can present clear and convincing evidence the person is not

15  likely to flee or pose a danger, then he is to be released.

16              The Court can look at his behavior out on bond and I

17  think his behavior on pretrial release was exemplary.  He had

18  absolutely no issues with pretrial violations of any kind.  He

19  was on time for every court appearance.  He was here in court

20  every day to answer these charges.  Never missed an appointment

21  with his attorneys.  He is certainly not a danger to anyone in

22  the community and these are nonviolent crimes and there's been

23  no evidence indicated that he would be a danger to society in

24  any way.

25              The government offers speculation as to what his

1    assets are as far as his ability to flee.  The Court has means

2    to make sure he cannot leave the jurisdiction and there's never

3    been an indication that he's ever attempted to leave the

4    jurisdiction.  They have no knowledge of what assets he has

5    available to him.  They're just making a speculative argument

6    based on what the loss amount is alleged in this case and what

7    they think he might have at his disposal.

8              His family is here.  He's lived in Michigan, I

9    believe, his entire life.  His wife is here.  His family has

10   been very supportive throughout this entire process.  He has

11   kids here.  He is not a risk to flee in any way.  And as far as

12   the alleged psychological evidence that the prosecution offers,

13   the letter that was just discussed by Ms. Brown is an old

14   letter.  That was not from his psychiatrist.  That was from

15   his -- I believe, his general physician.

16             He has been seen by a psychiatrist, Dr. Hazen, who has

17   been evaluating him ever since this supposed suicide attempt,

18   which we do not believe was a suicide attempt.  We believe that

19   was an accident.  But given that there was concern that that

20   may have been an issue, he was evaluated.  Dr. Hazen has been

21   monitoring him ever since that date.  Has provided regular

22   correspondence to pretrial services and to the Court monthly

23   and each time he has indicated that Mr. Warner, his affect is

24   good.  His mood is stable.

25             The fact that he has had -- battled depression in the

1  past and taken medication for that in the past, I think would
2  be inappropriate to judge him a risk of suicide based solely on
3  that.  I think he has shown that he respects the Court and the
4  court process and that he is not -- has made no attempt to
5  avoid the Court's jurisdiction and he's conducted himself
6  admirably throughout this process.

7          And I think Dr. Hazen's letters, which have
8  consistently indicated that he is not a risk to himself, I
9  believe that's clear and convincing evidence that Mr. Warner is
10 not a risk to flee.  Certainly not a risk to the community,
11 although I don't believe the government believes he is.  And
12 certainly not a risk to himself.  So for all of those reasons
13 we would oppose detention.

14         MR. HARRISON:  Your Honor, can I just add something,
15 please?

16         THE COURT:  Sure.

17         MR. HARRISON:  The government points to five point
18 whatever it is million dollars that Mr. Warner received from
19 the airport and then says that because they froze 4.5 million,
20 they don't know where the million went and they don't know what
21 he may have earned before so they don't know where that might
22 be.  They froze all of his assets.  He paid federal and state
23 income tax every year from those gross amounts.  So the gross
24 amount of five million dollars would be a net of three million
25 dollars.

1          So the 4.5 million that was seized and frozen would

2    have included any other funds that he had before that time.

3    And they certainly -- the FBI in this case certainly had the

4    ability to do a nationwide and worldwide search, if they wanted

5    to, for assets and I suspect they did.  So he doesn't have any

6    hidden assets.

7          Also, Your Honor, there are other things that can be

8    done.  First of all, his pole barn contained his machinery and

9    he was in there attempting to charge some of the batteries and

10   he had a generator using it.  And he was overcome by the fumes

11   and he was taken to a hospital.  Anytime you're taken to a

12   hospital under circumstances that someone might question, they

13   keep you for a seven-day evaluation.  And that's what they did.

14         And one of the doctors, who is his doctor there, was

15   Dr. Hazen, who is the doctor who sends an evaluation every

16   single month -- and I get a copy of it -- to the pretrial

17   release department.

18         Your Honor, you could do a number of things.  I mean,

19   you could impose a tether on him.  You could impose very strict

20   hours.  I mean, his brother and his wife could be his

21   supervisors for purposes of his bail and we could increase the

22   visits with Dr. Hazen.

23         I really don't see any reason in the world why the

24   prosecution didn't even voice an objection over the suicide

25   thing or the money at the time of his arraignment.  And,

1  basically, consented to his personal bond and now they're

2  saying that it should be detention.

3      I recognize it's a long sentence possibility, but,

4  Your Honor has total discretion and you'll decide the sentence.

5  And making the assumption that you're going to sentence him to

6  the maximum sentence is an inappropriate inference.

7      THE COURT:  All right.  Thank you, do you have

8  anything more, Ms. Brown?

9      MS. BROWN:  No, Your Honor.

10      THE COURT:  I think I want to hit the pause button on

11  this bond decision.  I do note that I have not gotten any

12  reports during the period of time that Mr. Warner has been on

13  bond that has suggested that he has not complied with bond.  I

14  have not received any of the letters nor have I read any of the

15  letters that have been submitted on a regular basis and I would

16  be interested on knowing what our file contains.  And also I

17  want to review the conditions that the Court has already set.

18      So I want to go in and have a chance to talk to the

19  jury.  I want to review that file and I will be back on this

20  record at one o'clock.

21      MR. HARRISON:  Your Honor, the letters were sent

22  directly by Dr. Hazen to the pretrial release person and I

23  received a copy of it.  I don't know if your court file will

24  have it, but pretrial will have it.

25      THE COURT:  The pretrial officer should have

1   everything if it was sent to him or her.

2           MR. HARRISON:  Yes.

3           THE COURT:  And I will get his file.

4           MR. HARRISON:  Thank you.

5           MR. GALEA:  Thank you.

6           THE COURT:  At one o'clock we'll be back.

7       (At 11:50 a.m., matter passed.)

8       (At 1:10 p.m., matter resumed.)

9           THE CLERK OF THE COURT:  All rise.  The United States

10  District Court for the Eastern District of Michigan is now in

11  session.  The Honorable Victoria A. Roberts presiding.

12          The Court calls the case of the United States versus

13  James Warner, case number 18-20255.

14          Counsel, your appearances, please.

15          MS. BROWN:  Good afternoon, again.  Eaton Brown and

16  Mark Chutkow appearing on behalf of United States.

17          THE COURT:  Good afternoon.

18          MR. CHUTKOW:  Good afternoon.

19          MR. HARRISON:  Good afternoon, Your Honor, Robert

20  Harrison and Nicholas Galea on behalf of James Warner who

21  stands to my left.

22          THE COURT:  Okay.  Thank you.

23          Good afternoon, everyone.  You can take your seats.

24          Counsel, do you have anything to put on the record in

25  addition to what I heard this morning on whether Mr. Warner

1   should be remanded or not.  Anything more?

2          MS. BROWN:  Not on behalf of the United States.

3          THE COURT:  Mr. Harrison or Mr. Galea?

4          MR. HARRISON:  Yes, Your Honor.  Mr. Warner informs me

5   that his most recent appointment with Dr. Hazen was this past

6   Saturday which is why you don't have any recent evaluation.

7          THE COURT:  Okay.  All right.  The last one I have is

8   May 4th.  Does that sound right, Mr. Warner?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Before this past Saturday?

11          THE DEFENDANT:  May ...

12          There should be one more.  I was just there on

13   Saturday.

14          THE COURT:  I know.  I don't have that report yet.

15          THE DEFENDANT:  Oh, yeah.

16          THE COURT:  But before this past Saturday, the most

17   recent one I have is May 4th.  Does that sound right?

18          THE DEFENDANT:  Yes, that's correct.

19          THE COURT:  So I did have an opportunity to get the

20   pretrial services report.  Mr. Hardy has been supervising

21   Mr. Warner, so I have all of the letters from Dr. Hazen.

22          The government says that ...

23     (Pause.)

24          THE COURT:  So the government argues under 18 U.S.C.

25   3143(a)(1), a person such as Mr. Warner who is awaiting

1   sentence can be released only if the judge finds by clear and
2   convincing evidence that the person is not likely to flee or to
3   pose a danger to a person or the community.

4           Under our court rules, the burden is on the defendant
5   to establish that he is not a flight risk and to establish that
6   he is not a danger to himself.

7           The government says that because of his sentence that
8   Mr. Warner is facing -- under the guidelines it's 292 to 365
9   months -- and because of funds that Mr. Warner may have access
10  to, that he has the ability to and poses a risk of flight.

11          The government relies in part on a July 17 letter from
12  Mr. Warner's doctor, which outlines a series of mental health
13  issues that Mr. Warner is suffering from and medications that
14  he is on.  And I believe the letter says also that because of
15  the mental health issues and the medication, Mr. Warner is in a
16  position to make poor choices and has poor judgment.

17          In response, the defendant says that the government
18  froze all of Mr. Warner's assets and that he does not have
19  access to large sums of money.  The defendant also says that
20  the government did not object to Mr. Warner's release in May of
21  '18 -- May of 2018 and has not objected to him being on bond
22  from then until now.

23          The defendant also says that -- oh, I forgot to say
24  the government also argues that in November of 2017 Mr. Warner
25  was overcome by carbon monoxide poisoning in an effort to

1   commit suicide.

2   In response to that suicide allegation, the defense

3   says that Mr. Warner was not attempting suicide, that he was in

4   his pole barn where heavy equipment is kept and that he was

5   overcome then by carbon monoxide.  He did end up in a hospital

6   for the period of time that he was there following that.  I

7   don't think anyone told me what that period of time was.

8   But the defendant does say there was no intention on

9   the part of Mr. Warner to commit suicide.

10  The defendant also says that since November of 2017,

11  he has treated regularly with Dr. Hazen and that he does not

12  present a risk of harm to himself or to others and that

13  conditions can be set that would ensure that he would not flee

14  and that would ensure that he would not do harm to himself or

15  to other people.

16  Since we broke, the Court has had an opportunity to

17  review the conditions that it did set on Mr. Warner.  Those

18  conditions were amended most recently in August of 29, '18 but

19  those conditions are that Mr. Warner report to pretrial

20  services as directed.  That he not obtain a passport or other

21  international travel documents.  That his travel be restricted

22  to the Eastern District of Michigan, that he not possess a

23  firearm, destructive device, et cetera.  That he surrender a

24  concealed pistol license and he continue mental health

25  treatment and take prescriptions as directed.

1       Mr. Demetrius Hardy has been supervising Mr. Warner

2   since then and reports to the Court that Mr. Warner has

3   satisfied all of the conditions of pretrial release that the

4   Court has imposed on him and the Court does know that nothing

5   has been brought to its attention concerning Mr. Warner's

6   behavior.

7       I also had an opportunity to review the letters that

8   have been regularly sent in to the Court by Toby Hazen.  He is

9   with Comprehensive Psychiatric Services and these letters

10  indicate that on a regular basis since June 30th of

11  2018 through the present -- and Mr. Warner says it

12  was through -- his most recent visit was this past Saturday

13  which was June 1.  That he has regularly seen Dr. Hazen.  This

14  Court does have reports from June 30th through May 4th.

15      I did take a look at them.  It appears that he

16  continues to be monitored for several mental health issues for

17  mood disorder.  He is on various medications and it appears

18  that in addition to the medication, that he is undergoing

19  psychotherapy with Dr. Hazen.  There are two reports here that

20  mention suicide.  The first one is a report dated June 30th,

21  2018.  Dr. Hazen says, "I asked the patient if he feels

22  suicidal, which he denies."

23      The report has much more in it beyond that.

24      The other report that I've been able to look at that

25  has any mention of suicide was a report dated January 5th of

1   2019.  It says the patient remains on Lexapro, Remeron and the

2   Court -- the doctor, I'm sorry, reduced his Abilify dose from

3   seven to five days a week.

4          And Dr. Hazen says, "When I asked if he felt suicidal,

5   he replied, 'No, I'm not suicidal.  I'm frustrated, yes.

6   Embarrassed and shame, yes, for letting my family down.'"

7          Now, based on the ongoing monitoring and the regular

8   interventions by Dr. Hazen, the Court believes that Mr. Warner

9   is not -- does not appear to be suicidal now.  And the

10  government did not mention the potential of harm to others,

11  only the potential of harm to himself.

12         So the Court does believe that the defense has

13  satisfied its burden by clear and convincing evidence that

14  Mr. Warner does not present a danger to himself.

15         With respect to the risk of flight, the Court believes

16  that that is satisfied as well.  The Court asks that Mr. Warner

17  surrender his passport.  He did do that.  It appears that he

18  does not have access to assets because those have been frozen.

19  And he does face a high sentence.  People in this jurisdiction

20  facing that amount of time have been out on bond before, have

21  reported for sentencing and the Court believes that the defense

22  has satisfied its burden here by clear and convincing evidence.

23  The Court will allow bond to continue.

24         Is there anything more?

25         MR. HARRISON:  Thank you, Your Honor.

1          THE COURT:  Anything from the government?

2          MS. BROWN:  Your Honor, the only thing that I would

3   ask the Court to inquire of Mr. Warner is I understand that he

4   was in possession of a number of firearms.  I know the Court

5   eluded to the fact that a condition of that was to surrender

6   his concealed pistol license, but we would ask the Court to

7   inquire of Mr. Warner if he has any firearms in his possession

8   or access to them, please.

9          THE COURT:  All right.  Thank you.

10         Mr. Warner, I believe you were to surrender a pistol.

11  Did you do that?

12         THE DEFENDANT:  Yes, Your Honor.  All the firearms

13  that I had owned were given to my brother who lives in Ann

14  Arbor.  And I typed up a letter and signed that and so did he.

15  And we provided a letter to Mr. Demetrius Hardy.

16         THE COURT:  And the letter says that all the firearms

17  have been given to your brother?

18         THE DEFENDANT:  Correct.

19         THE COURT:  Are there any firearms remaining in your

20  house?

21         THE DEFENDANT:  No, sir.  No, ma'am.  I'm sorry.

22         THE COURT:  All right.  Are you satisfied, Ms. Brown?

23         MS. BROWN:  I am, Your Honor.

24         THE COURT:  All right.  Thank you.  We're adjourned.

25         MR. HARRISON:  Thank you, Your Honor.

1          Your Honor?

2          THE COURT:  Is this on the record?

3          MR. HARRISON:  Probably.

4          THE COURT:  All right.

5          MR. HARRISON:  It will be quick.  I'm not an appellate

6    attorney, but I believe that if he wants to file a motion for a

7    new trial, I thought we had to get those documents from the

8    court.  Or maybe not.  I don't know.  Is that accurate?

9          THE COURT:  I don't know.  I think -- I don't know.

10          MR. HARRISON:  Okay.  We'll find out.

11          THE COURT:  You find out.

12          MR. HARRISON:  Okay.  Thank you.

13          THE COURT:  All right.  Thank you.

14      (At 1:23 p.m., matter concluded.)

15                          -   -   -

16

17

18

19

20

21

22

23

24

25

1          C  E  R  T  I  F  I  C  A  T  E

2

3          I, Darlene K. May, Official Court Reporter for the

4     United States District Court, Eastern District of Michigan, do

5     hereby certify that the foregoing is a true and correct

6     transcript, to the best of my ability, from the record of

7     proceedings in the above-entitled matter.  I further certify

8     that the transcript fees and format comply with those

9     prescribed by the Court and the Judicial Conference of the

10    United States.

11

12    March 27, 2020              /s/ Darlene K. May
      Date                        Darlene K. May, CSR, RPR, CRR, RMR
13                                Federal Official Court Reporter
                                  Michigan License No. 6479
14

15

16

17

18

19

20

21

22

23

24

25